UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BADGER DAYLIGHTING CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:24-cv-00912-TWP-TAB |
| ) | |
| SHANNON RUTHERFORD, ) | |
| ) | |
| Defendant. ) | |

### ORDER DENYING MOTION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER AND DIRECTING FURTHER ACTION

This matter is before the Court on Plaintiff Badger Daylighting Corp.'s ("Badger") Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief ("Motion") (Filing No. 6) filed pursuant to Federal Rule of Civil Procedure 65. Badger's Motion seeks an *ex parte* Temporary Restraining Order ("TRO") and Preliminary Injunction against Defendant Shannon Rutherford ("Rutherford"). Rutherford has not yet responded, so this Order addresses only Badger's request for a TRO.[1] For the reasons discussed below, Badger's request for an *ex parte* TRO is **denied**. Badger is **directed** to serve Rutherford with its Verified Complaint and Motion, and, pursuant to the Court's May 31, 2024 Order, the parties are **directed** to meet with the Magistrate Judge to discuss Badger's request for preliminary injunctive relief (Filing No. 17).

---

[1] Badger's request for a Preliminary Injunction is not yet ripe for ruling. The core difference between a temporary restraining order and a preliminary injunction is that the former may be issued "before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A); *see Geneva Assurance Syndicate, Inc. v. Med. Emergency Servs. Assocs. S.C.*, 964 F.2d 599, 600 (7th Cir. 1992) (finding that the essence of a temporary restraining order is "its brevity, its ex parte character, and . . . its informality," whereas a preliminary injunction: the latter is appealable, the former is not). Considering Rutherford has yet to be served, let alone respond and be heard, the Court only addresses Badger's request for a TRO.

## I. BACKGROUND

This action arises out of Rutherford's alleged breach of confidentiality and non-competition agreements with her former employer, Badger (Filing No. 1 at 1). Badger designs, develops, tests, and manufactures vehicles and equipment for nondestructive excavation and related services. *Id.* at 2. Due to the type of work Badger does and the competitive nature of its industry, Badger's relationships with its clients and its client information are extremely valuable. *Id.* at 2–3. As a result, Badger takes steps to maintain the confidentiality of its proprietary client information, including requiring employees to sign confidentiality agreements, storing information on password-protected computers, and prohibiting employees from accessing files or retrieving stored communications without prior authorization. *Id.* at 3.

Rutherford previously worked for Badger as an Outside Sales Representative in Texas and Louisiana. *Id.* at 3–4. In that role, she gained access to information about Badger's clients, developed and maintained business relationships with those clients, and developed an intimate knowledge of Badger's proprietary information. *Id.* at 3. As a condition of her employment with Badger, Rutherford signed a Confidentiality, Non-Solicitation and Non-Competition Agreement (the "Agreement") (Filing No. 1-1). The Agreement contains non-competition, non-solicitation, and confidentiality provisions, among others.

Rutherford resigned from Badger on April 29, 2024. *Id.* Shortly thereafter, she began working for one of Badger's competitors, Precision Hydrovac Excavation ("Precision"). On May 1, 2024, Badger sent a letter to Rutherford "reminding her of her obligations under the Agreement," though Badger did not then accuse Rutherford of wrongdoing. *Id.* at 9; (Filing No. 1-3). On May 8, 2024, Rutherford visited a Badger jobsite and spoke with two of Badger's employees, Gary Hickson ("Hickson") and Jacob Crochet ("Crochet") (Filing No. 1 at 10). Rutherford allegedly attempted to solicit Hickson and Crochet to work for Precision. During this conversation,

2

Rutherford told Hickson that she had called one of Badger's clients, Turner Industries ("Turner"), and Turner said Hickson was its "top choice" (Filing No. 7-6 at 3). Hickson believes his good relationship with Turner is what led Rutherford to solicit him. *Id.* Rutherford also told Hickson that another Badger client, Entergy of Louisiana ("Entergy") "had moved work to Precision." *Id.* Hickson rejected Rutherford's offer to work for Precision, but Rutherford kept calling him. Hickson eventually blocked Rutherford's calls. *Id.* Crochet later ended his employment at Badger, though Badger does not allege whether Crochet left to work for Precision.

On May 15, 2024, Badger, via counsel, sent a second letter to Rutherford. The May 15, 2024 letter accused Rutherford of violating several provisions of the Agreement (Filing No. 1-4). Badger sent a similar letter to Precision the same day (Filing No. 1-6). Just over a week later, counsel for Rutherford sent a response, arguing that several provisions in the Agreement are unenforceable, and denying that Rutherford violated any terms of her employment with Badger (Filing No. 1-5).

At some point prior to filing suit, Badger engaged a forensic examiner to examine Rutherford's Badger-issued work computer (Filing No. 1-2). The examination showed that in the months leading up to her last day with Badger, Rutherford connected an unauthorized USB device to her work computer; forwarded several work emails to her personal email account; accessed certain client files; and accessed and saved certain proprietary reports and a higher rate than usual (Filing No. 5–9).

Badger initiated this lawsuit on May 30, 2024, by filing a Verified Complaint alleging breach of contract, breach of fiduciary duty, and misappropriation of trade secrets in violation of the Indiana Uniform Trade Secrets Act and the Defend Trade Secrets Act (Filing No. 1). The same day, Badger filed the instant Motion (Filing No. 6). On May 31, 2024, Badger filed the Declaration

3

of its attorney, Heather Stanton ("Stanton"), explaining that Badger had not attempted to effectuate service on Rutherford and the reasons why (Filing No. 12). Also on May 31, 2024, the Court issued an Order directing the parties to meet with the Magistrate Judge to discuss a discovery plan, briefing schedule, and to determine a date for the hearing on preliminary injunctive relief (Filing No. 17). The Court clarified that it intended to issue a ruling on Badger's request for a TRO before the parties' meeting with the Magistrate Judge (Filing No. 18).

## II.     LEGAL STANDARD

A court may grant an order pursuant to an *ex parte* request only under extremely limited circumstances. *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 321 (7th Cir.1984). Under Federal Rule of Civil Procedure 65, the movant's attorney must certify in writing any efforts to give notice and the reasons that notice should not be required, and the court must conclude that the movant will suffer irreparable injury before the adverse party can be heard. Fed. R. Civ. P. 65(b). Under Rule 65(b)(2), a TRO may last up to fourteen days, unless before that time expires, it is extended for another fourteen days for good cause.

The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008). This analysis is the same to determine if a TRO is warranted. *Gray v. Orr*, 4 F. Supp. 3d 984, 989 n.2 (N.D. Ill. 2013). To warrant a TRO, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) plaintiff will suffer irreparable harm if the TRO is not granted. *See Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). If these elements are satisfied, the Court must then balance the harm to the plaintiff if the restraining order is denied against the harm to the defendant if the restraining order is granted. *Id.* The greater the movant's likelihood of success on the merits,

"the less strong a showing" the movant "must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

### III.   DISCUSSION

Before the Court reaches the two-step analysis, it must decide whether it may issue preliminary injunctive relief *ex parte*. Typically, a movant seeking a TRO attempts to notify the respondent but asserts that injunctive relief is so urgently needed that the movant simply cannot afford to wait for a response. Badger, by contrast, has not attempted to serve Rutherford and does not assert that injunctive relief is needed so immediately that it could not wait until after Rutherford is heard. Instead, Badger argues that it need not notify Rutherford for reasons related to spoliation and futility, and that the Court should therefore enter preliminary injunctive relief *ex parte*.

Federal Rule of Civil Procedure 65(b)(1) plainly states that a Court may enter an *ex parte* TRO only if: "(A) specific facts . . . clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." The Court concludes that Badger has not met either of these prongs, and *ex parte* relief is therefore unwarranted. The Court will address these prongs in reverse order, first discussing whether Badger has adequately explained why it has not attempted to serve Rutherford, and then whether Badger has clearly shown that immediate and irreparable injury will result before Rutherford can be heard.

A.   **Efforts to Notify Adverse Party and Reasons Why Notice Should not Be Required**

Stanton's Declaration states that Badger has not attempted to effectuate service on Rutherford ([Filing No. 12](#)). The Declaration asserts that service should not be required (1) "because Badger has reason to believe that [Rutherford] will or may modify or delete necessary evidence"; and (2) "because notice to Rutherford would be fruitless." *Id.* at 1–2. Neither reason is persuasive.

Badger does not offer any specific "reason to believe" that Rutherford would spoliate evidence upon service of Badger's Verified Complaint and Motion, and two facts suggest otherwise. First, Rutherford has known about Badger's allegations of wrongdoing since May 23, 2024, at the latest, yet Badger does not accuse her of having spoliated evidence to date. Badger offers no reason to suspect that Rutherford would spoliate evidence only upon service of Badger's Verified Complaint and Motion. Second, Rutherford has been represented by legal counsel since at least May 23, 2024. Although spoliation of evidence is a serious concern in any lawsuit, the risk that a defendant will spoliate evidence decreases when that defendant is represented by counsel. Rutherford's attorney, like all attorneys, is ethically obligated to prevent the spoliation of evidence, as well as the obstruction of Badger's access to evidence. Model Rules of Pro. Conduct r. 3.4 (Am. Bar Ass'n 2002). Upon service of the Verified Complaint and Motion, the Court expects that Rutherford's counsel will direct her client to preserve all relevant evidence, and the Court sees no reason to anticipate that Rutherford would ignore her counsel's directive.

Badger's "fruitlessness" argument is also unpersuasive. Stanton's Declaration states that "Badger has previously attempted to seek the relief through informal demand letters, but Rutherford has denied any wrongdoing, continued to breach her Agreement, and refused to cooperate in any regard" (Filing No. 12 at 2). Badger asserts that Rutherford should be denied an opportunity to be heard on this Motion simply because she would oppose the Motion. This argument ignores the reason why, barring exceptional circumstances, defendants are always granted an opportunity to respond to requests for preliminary injunctive relief. "The stringent restrictions on the availability of ex parte TROs 'reflect[s] the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted to both sides of a dispute." *Am. Girl, LLC v. Nameview, Inc.*, 381 F. Supp.

2d 876, 879–80 (E.D. Wis. 2005) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 438–39 (1974)).

The Seventh Circuit has recognized "a very narrow band of cases in which ex parte orders are proper because notice to the defendant would render fruitless the further prosecution of the action." *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir. 1984); *cf.*, *In the Matter of Vuitton er Fils S.A.*, 606 F.2d 1, 5 (2d Cir. 1979) (issuing *ex parte* TRO because plaintiff showed "it was highly probable that [alleged trademark] infringer would dispose of infringing goods in the few hours before the hearing"). Here, Badger does not argue that notice would render prosecution "fruitless," aside from its (unpersuasive) argument that Rutherford might spoliate evidence upon notice. Rather, Badger argues that notice would be futile (*i.e.*, "fruitless") in attempting to gain Rutherford's compliance with its demands. The latter argument does not justify depriving Rutherford of an opportunity to be heard on Badger's Motion.

**B.      Immediate and Irreparable Harm Before Adverse Party Can Be Heard**

Badger argues that absent injunctive relief, it will suffer irreparable harm. Badger focuses on harm resulting from Rutherford's solicitation of its employees, solicitation of its clients, and misuse of confidential and trade secret information. However, Badger has not identified specific facts clearly showing that this allegedly irreparable harm is sufficiently immediate to warrant an *ex parte* TRO.

Badger asserts that Rutherford attempted to solicit Hickson and Crochet on May 8, 2024 ([Filing No. 7-6 at 2](#)–3). But Hickson rejected Rutherford's offers and, on May 15, 2024, blocked her calls ([Filing No. 1 at 10](#)–11). Crochet left his employment with Badger as of May 21, 2024, but there is no evidence indicating that Crochet left to work for Precision ([Filing No. 7-2 at 6](#)). These allegations do not clearly show that Rutherford will solicit (successfully or otherwise) any other Badger employees, much less before Rutherford could be heard.

The allegations regarding Rutherford's solicitation of Badger's clients similarly lack the showing of urgency needed to justify an *ex parte* TRO. Badger's Verified Complaint and Motion allege that Rutherford has attempted to solicit three Badger clients: Turner, Entergy, and Legends Foundation ("Legends"). According to Hickson's Affidavit, Rutherford contacted Turner on or before May 8, 2024,[2] and attempted to solicit Turner's business for Precision (Filing No. 7-6 at 3). However, Turner declined Rutherford's offer. *Id.* Badger also alleges that Rutherford solicited Entergy on or before May 8, 2024, but offers no supporting evidence. Badger cites only Hickson's Affidavit, in which he states that Rutherford told him Entergy "had moved work to Precision," and that his "*understanding* was that Rutherford was bragging that this move was due to her efforts on behalf of Precision" (Filing No. 7-6 at 3 (emphasis added)). This statement does not identify when Entergy moved some of its work to Precision, or whether Rutherford solicited Entergy. Lastly, Badger reports "[o]n May 22, 2024, Legends told Badger that Rutherford had approached it at a Beaumont, Texas jobsite, claiming that 'Precision could complete the job twice as fast for half the price'" (Filing No. 7 at 12). Badger does not offer any evidence supporting this allegation (Filing No. 1 at ¶ 53 (making allegation "[o]n information and belief"); Filing No. 7 at 12 (citing no evidence)). Moreover, Badger does not identify the date Rutherford made this statement to Legends, as compared to the date Legends reported the statement to Badger. So this incident with Legends also does not support the conclusion that Rutherford will cause any immediate and irreparable harm to Badger by soliciting its clients before Rutherford can be notified and heard.

Badger also contends that Rutherford took confidential information from Badger and may misappropriate that information by sharing it with Precision. However, Badger offers only

---

[2] Since Rutherford allegedly discussed this solicitation during her May 8, 2024 conversation with Hickson, the solicitation presumably occurred on or before May 8, 2024.

circumstantial evidence that Rutherford took this information[3] and offers no evidence that Rutherford has shared or will imminently share it with Precision. Badger's concerns about its proprietary information are reasonable, but Badger nevertheless fails to clearly show it will be immediately injured before Rutherford can be heard.

In sum, Badger has clearly shown that Rutherford solicited two Badger employees and one Badger customer on or before May 8, 2024, none of whom moved to Precision as a result. This evidence does not show that the risk of irreparable harm to Badger is so immediate that Rutherford should not first be given an opportunity to be heard.[4]

The Court further notes that because Rutherford is represented by legal counsel,[5] Badger should be able to serve Rutherford via counsel expediently, and Rutherford should be able to respond to the Motion and/or prepare for a hearing much quicker than if Rutherford was *pro se*. Badger has not "clearly shown" that it will incur "immediate and irreparable injury" before Rutherford is given an opportunity to respond.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES in part** Badger's Motion as to its request for an *ex parte* Temporary Restraining Order (Filing No. 6). Badger's Motion (Filing No. 6) Preliminary Injunction **REMAINS PENDING**.

---

[3] For example, Badger alleges that Rutherford used an unauthorized USB device on her work computer in February 2024 but offers no evidence showing that Rutherford downloaded confidential information onto the device (Filing No. 1 at 5). Badger also alleges that Rutherford increased her access to certain Badger files shortly before her departure but does not show whether Rutherford took that information or intends to share it with Precision. *Id.* at 6–9.

[4] To be clear, the Court is not presently deciding whether Badger has or will suffer "irreparable" injury absent preliminary injunctive relief. Rather, the Court is narrowly deciding that Badger has not clearly shown it will incur the type of immediate injury justifying *ex parte* injunctive relief, as required by Federal Rule of Civil Procedure 65(b)(1).

[5] Badger did not list the contact information for Rutherford's counsel in its Civil Cover Sheet (Filing No. 3).

Badger is **DIRECTED** to serve Rutherford with its Verified Complaint and Motion. Further, pursuant to the Court's May 31, 2024 Order (Filing No. 17), the parties are **DIRECTED** to meet with the Magistrate Judge to discuss a discovery plan, briefing schedule, and the hearing on Badger's request for preliminary injunctive relief.[6] Badger may raise its concerns regarding spoliation of evidence with the Magistrate Judge at the meeting.

**SO ORDERED**.

Date: 6/3/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Adam Arceneaux
ICE MILLER LLP (Indianapolis)
adam.arceneaux@icemiller.com

Abby DeMare
Ice Miller LLP
abby.demare@icemiller.com

---

[6] The docket reflects that a telephone conference with the Magistrate Judge is scheduled for June 4, 2024 at 4:00 PM.

10