## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BADGER DAYLIGHTING CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00912-TWP-TAB |
| | ) | |
| SHANNON RUTHERFORD, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER ON DEFENDANT'S MOTION TO DISMISS

This matter is before the Court on Defendant Shannon Rutherford's ("Rutherford") Motion to Dismiss filed pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). (Filing No. 41). Plaintiff Badger Daylighting Corporation ("Badger") initiated this lawsuit seeking injunctive relief and damages against Rutherford for breach of contract, breach of fiduciary duties, and misappropriation of trade secrets under the Indiana Uniform Trade Secrets Act ("IUTSA"), Ind. Code § 24-2-3-2, and the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836. (Filing No. 1). Rutherford previously consented to entry of a preliminary injunction, and that Order was granted on February 3, 2025. (Filing No. 96, Filing No. 97). For the reasons explained below, Rutherford's Motion to Dismiss is **denied**.

### I.    BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the Complaint and draws all inferences in favor of Badger as the non-moving party. *See Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

A. **Rutherford's Employment and Resignation**

Badger is a Nevada corporation with its principal place of business in Hendricks County, Indiana. (Filing No. 1 ¶ 5). Badger designs, develops, tests, and manufactures vehicles and equipment for nondestructive excavation and related services. *Id.* ¶ 11. Due to the type of work Badger does and the competitive nature of its industry, Badger's relationships with its clients and its client information are extremely valuable. *Id.* ¶¶ 12–13. As a result, Badger takes steps to maintain the confidentiality of its proprietary client information, including requiring employees to sign confidentiality agreements, storing information on password-protected computers, and prohibiting employees from accessing files or retrieving stored communications without prior authorization. *Id.* ¶ 14.

Rutherford is a citizen of Louisiana. *Id.* ¶ 6. She previously worked for Badger as an Outside Sales Representative in Texas and Louisiana. *Id.* ¶¶ 15, 20. In that role, she gained access to information about Badger's clients, developed and maintained business relationships with those clients, and developed an intimate knowledge of Badger's proprietary information. *Id.* ¶ 16. As a condition of her employment, Rutherford signed a Confidentiality, Non-Solicitation, and Non-Competition Agreement (the "Agreement"). (Filing No. 1-1). The Agreement contains non-competition, non-solicitation, and confidentiality provisions, among others.

Rutherford resigned from Badger on April 29, 2024. (Filing No. 1 ¶ 15). Shortly thereafter, she began working for one of Badger's competitors, Precision Hydrovac Excavation ("Precision"). *See id.* ¶ 2. On May 1, 2024, Badger sent a letter to Rutherford reminding her of her obligations under the Agreement, though Badger did not then accuse Rutherford of wrongdoing. *Id.* ¶ 41; (Filing No. 1-3). On May 8, 2024, Rutherford visited a Badger jobsite and spoke with one of Badger's employees, Gary Hickson ("Hickson"). (Filing No. 1 ¶ 44). Rutherford approached

Hickson and offered him a guaranteed forty hours a week of work if he would leave Badger and work for Precision. *Id.* During this conversation, Rutherford told Hickson that she had called one of Badger's clients, Turner Industries ("Turner"), and Turner said Hickson was its "top choice" for performing its work. *Id.* ¶ 45. Rutherford also told Hickson that another Badger client, Entergy of Louisiana ("Entergy"), had moved work to Precision "due to her efforts." *Id.* ¶ 47. After the May 8, 2024, meeting, Rutherford tried repeatedly to contact Hickson, who eventually blocked Rutherford's calls. *Id.* ¶ 48.

On May 15, 2023, Badger, via counsel, sent a second letter to Rutherford accusing her of violating the non-competition, non-solicitation, and confidentiality provisions of the Agreement. (Filing No. 1-4). Badger sent a similar letter to Precision the same day. (Filing No. 1-6). Just over a week later, counsel for Rutherford responded, arguing that several provisions of the Agreement were unenforceable, and denying that Rutherford violated any terms of her employment with Badger. (Filing No. 1-5).

At some point prior to filing suit, Badger engaged a forensic examiner to examine Rutherford's Badger-issued work computer. (Filing No. 1-2). The examination showed that in the months leading up to her last day with Badger, Rutherford connected an unauthorized USB device to her work computer; forwarded several work emails to her personal email account; accessed certain client files; and accessed and saved certain proprietary reports at a higher rate than usual. *Id.*; (Filing No. 1 ¶ 36).

**B.  The Agreement**

Rutherford signed the Agreement on November 17, 2021. (Filing No. 1-1 at 7). The Agreement provided that it would be governed by Indiana law and that disputes were to be brought

in state or federal courts in Indiana. *Id.* Four covenants within the Agreement are in dispute here.

First is the covenant not to compete in Paragraph 1:

> Employee covenants and agrees that during his/her employment, and for a period of twenty-four (24) months thereafter, Employee shall not engage in Prohibited Activity within the Restricted Area. . . . As used herein, "Prohibited Activity" includes any activity in which Employee performs, directly or indirectly, services analogous to those performed by Employee during their employment with the Corporation … for or on behalf of an entity engaged in the same or similar business as the Corporation . . . within the Restricted Area. . . . As used herein, the term "Restricted Area" shall include the following geographic areas: (i) state(s) where Employee provided services for Corporation during Employee's employment; and (ii) the physical location of any customer of Corporation for whom Employee performed services.

(Filing No. 1-1 at 2–3). Second is the covenant not to disclose in Paragraph 2:

> Employee recognizes and understands that . . . the Corporation possesses and will continue to possess, information which has been created, discovered, developed by or otherwise become known to the Corporation . . . which information has commercial value to the Corporation, including but not limited to trade secrets, innovations, equipment designs, processes, computer codes, data, know how, improvements, discoveries, developments, techniques, marketing plans, strategies, costs, current and prospective customers, current and prospective client lists, price lists, vendor lists, and/or any information Employee has reason to know the Corporation would like to treat as confidential for any purpose … ("Confidential Information"). Employee further recognizes and understands that in the performance of their employment duties and responsibilities as outlined in this Agreement, Employee will become knowledgeable with respect to a wide variety of the Corporation's Confidential Information. . . . Employee expressly agrees and covenants that Employee will not, at any time during or after Employee's employment with the Corporation: (i) disclose to others, or use . . . any Confidential Information except as may be necessary in the performance of Employee's employment with the Corporation, unless previously authorized in writing . . . and (ii) by any means, transfer or forward outside of the Corporation's compute network any of the Corporation's information, including, without limitation, Confidential Information, without the prior written consent of Corporation.

*Id.* at 3. Third is the covenant not to solicit employees in Paragraphs 3:

> Employee therefore agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee who is (or was in the previous twelve (12) months) employed or engaged by the Corporation ("Covered Employee"), or induce the voluntary termination of employment of any Covered

Employee for a period of twenty-four (24) months, beginning on the last day of Employee's employment with Corporation.

*Id.* at 4. Fourth is the covenant not to solicit customers in Paragraph 4:

Employee therefore agrees and covenants that Employee shall not, during the term of this Agreement and for a period of twenty-four (24) months following the termination of this Agreement for any reason (the "Non-Solicitation Period"), in any capacity or manner, whether directly or indirectly, individually or in partnership or otherwise jointly or in concert with any other entity, solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, or meet with the Corporation's current or prospective Customers (as defined below) for purposes of offering goods or services similar to or competitive with those offered by the Corporation or to convince any such customer to acquire services from another person or entity which are similar to the services provided by the corporation.

*Id.* at 4–5. The Agreement defined "customers" as:

(i) [A]ny person or entity to whom the Corporation has provided services during the preceding twelve months prior to the start of the Non-Solicitation Period; (ii) any person or entity to whom Employee provided services during the preceding twelve months prior to the start of the Non-Solicitation Period; or (iii) any such persons or entities known by Employee to have been targeted or contacted by the Corporation for the sale of such services during the preceding twelve months prior to the start of the Non-Solicitation Period.

*Id.* at 5. The covenant not to solicit customers applied to "[c]ustomers or prospective customers . . . whom Employee serviced, solicited, or contacted in any way during the past twelve (12) months of Employee's employment with the Company within the Restricted Area," or "customers about whom Employee has trade secret or Confidential Information." *Id.*

## C. **Badger's Lawsuit**

Badger initiated this lawsuit on May 30, 2024, alleging claims for Count One: Breach of Contract (Confidentiality), Count Two: Breach of Contract (Nonsolicitation), Count Three: (Breach of Contract Noncompete), Count Four: Breach of Fiduciary Duties, Count Five: Misappropriation of Trade Secrets Claim (Indiana Uniform Trade Secrets Act), and Count Six: Misappropriation of Trade Secrets Claim (Defend Trade Secrets Act, 18 U.S.C. § 1836, Et. Seq.).

(Filing No. 1).   The same day, Badger filed a Motion for Temporary Restraining Order and Preliminary Injunctive relief.  (Filing No. 6).  The Court denied the *ex parte* Temporary Restraining Order on June 3, 2024, while the request for a preliminary injunction remained pending.  (Filing No. 25).  On July 22, 2024, Rutherford filed the instant Motion to Dismiss.  (Filing No. 41).   The parties later consented to the preliminary injunction, which took effect on February 3, 2025. (Filing No. 97).

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(2) permits dismissal when a Court lacks personal jurisdiction over the defendant.  Fed. R. Civ. P. 12(b)(2).  When deciding a Rule 12(b)(2) motion, the Court accepts the factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff if they weigh on the issue of personal jurisdiction.  *Int'l Med. Grp., Inc. v. Am. Arb. Ass'n*, 149 F. Supp. 2d 615, 623 (S.D. Ind. 2001).  But where a complaint consists of conclusory allegations unsupported by factual assertions, the complaint fails even under the liberal standard of Rule 12(b).  *Id.*

When considering a motion to dismiss for lack of personal jurisdiction, the Court examines the sufficiency of the complaint, not the merits of the lawsuit.  *Id.*  The complaint does not need to include factual allegations concerning personal jurisdiction, but if the defendant moves to dismiss the action under Rule 12(b)(2), the plaintiff bears the burden of demonstrating the existence of personal jurisdiction.  *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).  The Court may consider affidavits and all other documentary evidence that have been filed, and any conflicts must be resolved in favor of the plaintiff as the non-moving party.  *Int'l Medical Group*, 149 F. Supp. 2d at 623.

The level of the plaintiff's burden to show personal jurisdiction depends on whether an evidentiary hearing has been held. *Purdue Research*, 338 F.3d at 782. Where a hearing has been conducted, the plaintiff must show by a preponderance of the evidence that personal jurisdiction exists. *Id.* Where no hearing is conducted and the motion to dismiss is decided solely on written materials, the plaintiff must establish a *prima facie* case that personal jurisdiction exists. *Id.*

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633.

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.

### III.    DISCUSSION

As a threshold matter, Rutherford argues that the Complaint should be dismissed because this Court lacks personal jurisdiction over her. (Filing No. 42 at 3). Alternatively, she argues for dismissal based on the failure to state a claim for which relief can be granted. *Id.* at 9.

As another district court within the Seventh Circuit succinctly noted, "jurisdiction is a threshold requirement that must be satisfied before a court can pass judgments on the merits."

*Rawlins v. Select Specialty Hosp. of Nw. Ind., Inc.*, 2014 U.S. Dist. LEXIS 57076, at \*4 (N.D. Ill. Apr. 23, 2014).  "The court must satisfy itself that it can exercise personal jurisdiction over [defendant] before it addresses the merits of the case.  Accordingly, the court must consider [the] motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) before it can address the Rule 12(b)(3) and Rule 12(b)(6) motions."  *Id.* at \*5.  "If the court determines that it lacks personal jurisdiction over [defendant], it would be improper for this court to reach the merits of the case." *Id.*  "'Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'"  *United States v. Rachuy*, 743 F.3d 205, 211 (7th Cir. 2014) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)).  For this reason, the Court first reviews the Defendant's Motion to Dismiss under Rule 12(b)(2).

### A.  Personal Jurisdiction over Rutherford

In general, parties may consent to personal jurisdiction through a forum selection clause. *See TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 589 (7th Cir. 2005).  A valid forum selection clause, standing alone, can confer personal jurisdiction.  *Id.*  "In contracts containing a choice of law clause . . . the law designated in the choice of law clause would be used to determine the validity of the forum selection clause."  *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 775 (7th Cir. 2014).

Rutherford argues that both the forum selection clause and the choice of law clause in the Agreement are unenforceable, and therefore, the forum selection clause cannot support personal jurisdiction in Indiana.  In Rutherford's view, applying Indiana law pursuant to the choice of law clause would violate Louisiana public policy, which has a materially greater interest in this litigation than Indiana does.  Badger responds that it would be inappropriate at the motion to

dismiss stage to determine whether Louisiana has a materially greater interest in the dispute, but in any event, the choice of law clause is enforceable. Because the validity of the forum selection clause turns on the validity of the choice of law clause, the Court will address the validity of the choice of law provision before moving to the forum selection clause.

### 1. **The Choice of Law Clause**

A federal court sitting in diversity applies the choice of law rules of the state in which the court sits. *Jackson*, 764 F.3d at 774 (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). This case was brought in federal court in Indiana; therefore, the Court must apply Indiana's choice of law rules. Indiana choice of law principles generally favor agreements as to governing law, subject to a limited "public policy" exception. In particular, "Indiana will not enforce a contractual provision, including a choice of law provision, if enforcement would be contrary to Indiana's public policy." *Dearborn v. Everett J. Prescott, Inc.*, 486 F. Supp. 2d 802, 812 (S.D. Ind. 2007) (citing *Schaffert v. Jackson Nat'l Life Ins. Co.*, 687 N.E.2d 230, 234 (Ind. App. 1997)).

Rutherford does not—and could not— contend that enforcing the choice of law provision here would violate Indiana public policy. Her argument must fail, therefore, on that basis alone. Nevertheless, Rutherford argues that the public policy exception found in Section 187 of the Restatement (Second) of Conflict of Law should apply. On occasion, this Court has opined that Indiana law on the public policy exception "appears to be consistent with the more detailed guidance available from [§ 187], which states [in relevant part]:

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either
>
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

>  (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

*Dearborn*, 486 F. Supp. 2d at 812–13 (citing Restatement (Second) Conflict of Law § 187). Rutherford argues that Louisiana has a materially greater interest in the action because she is a Louisiana citizen, she performed the contract in Louisiana, and the events giving rise to the suit took place in Louisiana.  She tells the Court that enforcing the Indiana choice of law provision would offend La. Rev. Stat. 23:921(A)(2), which expresses Louisiana's "strong public policy" disfavoring agreements as to governing law.[1] ([Filing No. 42 at 8](#), citing *Sawicki v. K/S Stavanger Prince*, 802 So.2d 598, 603 (La. 2001)).  Badger disagrees, arguing that Indiana has a substantial relationship to the parties given that its principal place of business is in Indiana and Rutherford worked for an Indiana company, and that Louisiana does not have a materially greater interest in the action because Rutherford does not work exclusively in Louisiana.

The Court is not convinced that § 187(2)(b) applies to invalidate the choice of law provision in this case.  Rutherford identifies no Indiana case—and the Court is aware of none—applying Indiana's public policy exception to invalidate an Indiana choice of law provision based on another state's public policy.  To the contrary, Indiana courts generally enforce Indiana choice of law

---

[1] La. Rev. Stat. 23:921A(2) provides:

> The provisions of every employment contract or agreement, or provisions thereof, by which any foreign or domestic employer or any other person or entity includes a choice of forum clause or choice of law clause in an employee's contract of employment or collective bargaining agreement, or attempts to enforce either a choice of forum clause or choice of law clause in any civil or administrative action involving an employee, shall be null and void except where the choice of forum clause or choice of law clause is expressly, knowingly, and voluntarily agreed to and ratified by the employee after the occurrence of the incident which is the subject of the civil or administrative action.

provisions without exception.  *See, e.g.*, *Allen v. Great Am. Rsrv. Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002).  That is likely because Indiana courts are concerned with whether enforcing the parties' choice to apply *another state's law* would offend *Indiana* public policy. *See Schaffert*, 687 N.E.2d at 232–33 (applying Illinois law as consistent with Indiana public policy); *Alli v. Eli Lilly & Co.*, 854 N.E.2d 372, 379–80 (Ind. Ct. App. 2006) (applying Michigan law as consistent with Indiana public policy).  Because Rutherford cannot show that enforcing the Indiana choice of law clause would offend Indiana public policy, the choice of law clause is enforceable.

Relying on *Zimmer, Inc. v. Sharpe*, Rutherford contends further that "application of § 187(2)(b) doesn't depend on whether the public policy at issue is that of the forum state or some other state."  651 F. Supp. 2d 840, 850 (N.D. Ind. 2009) ("*Zimmer II*").  Once again, however, Rutherford provides no case law, in this Court or in any other federal court in Indiana, applying § 187(2)(b) to determine whether enforcing an Indiana choice of law provision would offend another state's policy *with respect to choice of law provisions*.  Indeed, doing so would contravene the well-settled principle that a court sitting in diversity applies the forum state's choice of law rules.

Instead, federal courts in Indiana that have applied § 187(2)(b) are concerned primarily with whether enforcing a choice of law provision would offend another state's public policy with respect to *the subject matter in the contract*.  *See, e.g.*, *Zimmer II*, 651 F. Supp. 2d at 851–52 (holding that, although Louisiana had a materially greater interest in the action, applying the Indiana choice of law provision to determine the enforceability of the restrictive covenants would not offend Louisiana public policy with respect to such agreements); *Dearborn*, 486 F. Supp. 2d at 818–819 (disregarding Maine choice of law provision where Indiana had a materially greater interest in the litigation and applying Maine law with respect to the enforceability of restrictive

covenants would be contrary to Indiana public policy); *see also South Bend Consumers Club, Inc. v. United Consumers Club, Inc.*, 572 F. Supp. 209, 212–13 (N.D. Ind. 1983) (applying § 187 in a federal question case to void an Illinois choice of law provision where Indiana had a materially greater interest in the action and applying Illinois law to uphold the restrictive covenant would offend Indiana public policy against unreasonable covenants).  For what it's worth, the Court agrees with the Northern District of Indiana that application of Indiana law would not offend Louisiana's fundamental public policy with respect to non-competition agreements "[g]iven Louisiana Supreme Court's willingness to reform non-competition agreements by striking invalid provisions," among other things.  *Zimmer II*, 651 F. Supp. 2d at 852.  For purposes of enforcing the choice of law provision, however, the Court need not determine whether applying the Indiana choice of law provision would contravene La. Rev. Stat. 23:921(A)(2).  *See also Klaxon*, 313 U.S. at 498 ("The full faith and credit clause does not go so far as to compel [the forum state] to apply [another state's laws] if such application would interfere with [the forum state's] local policy.").  Therefore, the choice of law provision here is enforceable, and Indiana law governs the Agreement.

### 2.  <u>The Forum Selection Clause</u>

Under Indiana law, "parties may consent by contract to the exercise of personal jurisdiction by courts that otherwise might not have such jurisdiction." *Everdry Mktg. & Mgmt., Inc. v. Carter*, 885 N.E.2d 6, 10 (Ind. Ct. App. 2008).[2]  Accordingly, when a forum selection clause is "valid and enforceable, then challenges to personal jurisdiction are waived." *FinishMaster, Inc. v. Walker*, No. 1:16-CV-02302, 2017 WL 7370984, at *3 (S.D. Ind. Sept. 19, 2017).  In Indiana, forum

---

[2] Applying Indiana law to the forum selection clause in this case is consistent with the rule that "[i]n contracts containing a choice of law clause . . . the law designated in the choice of law clause would be used to determine the validity of the forum selection clause." *Jackson*, 764 F.3d at 775 (citing *Abbott Labs. v. Takeda Pharm. Co.*, 476 F.3d 421, 423 (7th Cir. 2007)).  In reply, Rutherford argues that this rule is inapplicable because it assumes that the choice of law provision is enforceable.  (<u>Filing No. 49 at 1</u>, citing *Jackson*, 764 F.3d at 775).  Having determined that the choice of law clause here is valid, the Court rejects this argument as moot.

selection clauses are valid and enforceable if: (1) they are just and reasonable under the circumstances; (2) there is no evidence of fraud or overreaching such that the agreeing party would be deprived of her day in court; and (3) they were freely negotiated. *Grott v. Jim Barna Log Sys.-Midwest, Inc.*, 794 N.E.2d 1098, 1102 (Ind. Ct. App. 2003).

The Agreement designates the state and federal courts in Indiana as the proper venue for settling disputes arising under the Agreement. (Filing No. 1-1 at 7). Rutherford makes no argument that the forum selection clause is unjust or unreasonable, nor does she contend that the contract itself was procured by fraud or overreaching or that it was not freely negotiated. As with the choice of law provision, she argues that enforcing the forum selection clause would violate Louisiana public policy. However, in line with the choice of law principles discussed above, "[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of *the forum in which suit is brought*." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972) (emphasis added). Rutherford makes no argument that the forum selection clause in her employment agreement contravenes a strong public policy of Indiana; therefore, the forum selection clause is enforceable and supports the Court's exercise of personal jurisdiction.

**B. <u>Request to Dismiss for Failure to State a Claim</u>**

Rutherford argues that each of the claims brought by Badger should be dismissed under Rule 12(b)(6) because the allegations fail to state claims upon which relief can be granted. The Court will examine each claim in turn.

**1. <u>Breach of the Confidentiality Provision and Violations of IUTSA and DTSA</u>**

Counts One, Five, and Six allege breach of contract with respect to the confidentiality provision, as well as misappropriation of trade secrets claims under the Indiana Uniform Trade

Secrets Act, Ind. Code § 24-2-3-2, and the federal Defend Trade Secrets Act, 18 U.S.C. § 1836. "Though framed as separate legal claims, the same facts control Badger's breach of contract claim and its IUTSA claim." *Badger Daylighting Corp. v. Palmer*, No. 19-cv-02106, 2019 WL 4572798, at *7 (S.D. Ind. Sept. 20, 2019). Because the claims are analytically similar, therefore, the Court will discuss them together. *See id.*

To state a claim for misappropriation of a trade secrets, the plaintiff must allege that the information at issue was a trade secret, that it was misappropriated, and that it was used in the defendant's business. *See Genesys Telecomms. Labs., Inc. v. Morales*, No. 19-cv-00695, 2019 WL 6682171, at *6 (S.D. Ind. Dec. 6, 2019). A trade secret is information that "(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ind. Code § 24-2-3-2; *see also* 18 U.S.C. § 1839(3)(A). Importantly, trade secrets are a "subset of all commercially valuable information." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002). "Misappropriation" means, in relevant part:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> > (A) used improper means to acquire knowledge of the trade secret;
> >
> > (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> >
> > > (i)    derived from or through a person who had utilized improper means to acquire it;

14

   (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

   (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use

Ind. Code § 24-2-3-2. "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means." *Id.*

  Rutherford argues that the Complaint fails to identify any trade secrets she allegedly misappropriated, fails to allege what was transferred to or from the USB drive, and fails to establish that information she sent to her personal email contained confidential or trade secret information. (Filing No. 42 at 19–24). She argues further that the Complaint contains no allegation that she shared any confidential information or accessed information that she should not have. *See id.* Badger contends that the Complaint specifically alleges that Rutherford misappropriated confidential information concerning Badger's clients and prospective clients, confidential marketing tools, training matters, service proposals, and internal analytical tools when she accessed the information prior to her departure. (Filing No. 48 at 27–30). Badger also alleges that Rutherford sent what appears to be confidential information to her personal email account regarding Badger jobs, billings, and commissions. *See id.*

  The Court concludes that the Complaint alleges sufficient facts to state a claim for breach of the confidentiality provision and misappropriation of trade secrets. Although Rutherford correctly notes that merely accessing information on her work computer at a higher rate in the weeks prior to her departure would be insufficient on its own, the Complaint also states that Rutherford sent to her personal email "specific Badger information regarding jobs, billings, and commissions." (Filing No. 1 ¶ 30). Taken together, and construing the facts in Badger's favor,

these allegations are sufficient to state breach of contract and misappropriation claims. Information regarding Badger jobs, billings, and commissions are considered "Confidential Information" that derives economic value under the confidentiality agreement and were subject to Badger's efforts to maintain secrecy by requiring employees to sign a confidentiality agreement and to access information through password protected computers. In addition, courts regularly find that similar categories of information qualify as either confidential information or trade secrets when they are subject to efforts to maintain secrecy. *Toyota Indus. Equip. Mfg., Inc. v. Land*, No. 1:14-cv-1049, 2014 WL 3670133, at *2–3 (S.D. Ind. July 21, 20214) (characterizing customer information and financial documents as confidential); *Star Sci., Inc. v. Carter*, 204 F.R.D. 410, 414 (S.D. Ind. 2001) (concluding that customer lists and pricing information are protectable trade secrets). Moreover, the Agreement plainly prohibits "transfer[ing] or forward[ing] outside of the Corporation's computer network any of the Corporation's information, including, without limitation, Confidential Information." (Filing No. 1-1 at 3). Transmitting confidential Badger documents to one's personal email falls squarely within the terms of the Agreement and constitutes a breach of Rutherford's duty to maintain secrecy.

The Federal Rules are satisfied when the allegations are "plausible" such that they put the defendant on notice of the claims. *See Twombly*, 556 U.S. at 555, 570; *Romary Assocs., Inc. v. Kibbi LLC*, No. 1:10-CV-376, 2011 WL 13254419, at *4 (N.D. Ind. June 17, 2011). Because allegations in the Complaint provide Rutherford with notice as to the substance of the claims, they are sufficient to state a claim for breach of contract and misappropriation of trade secrets. Therefore, the Motion to Dismiss Counts One, Five, and Six is **denied**.

## 2. **Breach of the Restrictive Covenants**

Counts Two and Three of the Complaint allege breaches of the non-solicitation and non-competition agreements.  Count Two alleges that Rutherford solicited two Badger employees, Gary Hickson and Jacob Crochet,[3] in violation of the covenant not to solicit employees in paragraph 3 of the Agreement.  (Filing No. 1 at ¶¶ 59–64).  Count Two also alleges Rutherford solicited two Badger customers, Entergy and Turner, in violation of the covenant not to solicit customers in paragraph 4 of the Agreement.  *Id.* Count Three alleges that Rutherford left Badger to work for a direct competitor, Precision, shortly after her resignation in violation of the non-competition agreement.  *Id.* ¶¶ 65–69.

To state a claim for breach of contract in Indiana, the plaintiff must allege: (1) the existence of a contract; (2) the defendant's breach of that contract; and (3) damages resulting from the breach. *Aegean, LLC v. Meridian Senior Living, LLC*, No. 1:19-cv-2020, 2019 WL 4142880, at *3 (S.D. Ind. Aug. 30, 2019) (citing *BloomBank v. United Fid. Bank F.S.B.*, 113 N.E.3d 708, 725 (Ind. Ct. App. 2018)).  In general, Indiana treats covenants not to compete as agreements that are in restraint of trade and contrary to public policy.  *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 172 (Ind. Ct. App. 2008).  Such covenants "are strictly construed against the employer and are enforced only if they are reasonable."  *Id.* (citing *Cent. Ind. Podiatry v. Krueger*, 882 N.E.2d 723, 728–29 (Ind. 2008)).  In assessing the reasonableness of a non-competition agreement, the employer must show it has a legitimate interest to be protected by the agreement.  *Krueger*, 882 N.E.2d at 729. The employer must also establish the covenant is reasonable in scope as to time, activity, and geographic area restricted.  *Id.*

---

[3] Jacob Crochet is mentioned for the first time in paragraph 61 of the Complaint, and his name appears nowhere else in the pleadings presently before the Court.  However, because the Complaint plausibly alleges that Rutherford attempted to solicit Hickson after the termination of her employment, the claim that Rutherford breached the non-solicitation-of-employees agreement may proceed.

Recall that the "Non-Solicitation of Employees" agreement prohibited Rutherford from soliciting any employee who is (or was in the previous twelve months) employed by Badger for two years after the termination of her employment. (Filing No. 1-1 at 4). Similarly, the "Non-Solicitation of Customers" agreement prohibited Rutherford from soliciting any current or prospective Badger customers to whom either Badger or Rutherford provided services during the previous year. *Id.* at 4–5. The covenant against competition restricted Rutherford from engaging in activity "analogous to" that which she performed during her employment for two years after her employment within the states where she provided services for Badger and within the physical location of any Badger customer for whom she performed services. *Id.* at 3.

Rutherford asks the Court to dismiss the claims in Counts Two and Three because the restrictive covenants are unenforceable under Indiana law. (Filing No. 42 at 17). She offers several reasonableness arguments with respect to each covenant, including that they are overbroad in geographic scope and activities prohibited. In response, Badger avers that Rutherford's arguments are premature at the motion to dismiss stage because reasonableness is a fact-intensive question. (Filing No. 48 at 14–15).

At this stage of the litigation, the Court concludes that the Badger has adequately pleaded the existence of a contract, a breach thereof, and damages in accordance with Indiana law. Moreover, Badger is correct that while reasonableness is a matter law, "it ultimately resides in the facts and circumstances of each individual case." *Young v. Van Zandt*, 449 N.E.2d 300, 304 (Ind. Ct. App. 1983). At this procedural posture, the parties have not yet developed sufficient facts to enable the Court to decide whether the restrictive covenants are reasonable. For example, the parties each state, as a general matter, that Rutherford worked in "portions" of Louisiana and Texas. Without a clearly defined work area, it is nearly impossible to know whether restricting Rutherford

18

to the area where she provided services is reasonable.  There are also insufficient facts regarding Badger's employees and customers to determine the reasonableness of the non-solicitation agreements.  Notably, all the cases Rutherford cites to support her reasonableness arguments involve a post-evidentiary stage of litigation.  At that later stage, the Court may find that the covenants are "unreasonable under any set of facts," and if so, they "will be deemed to be unenforceable."  *Id.*  At this juncture, however, dismissal on reasonableness grounds is not proper.  *See also Global Archery Prods., Inc. v. Firgaira*, No. 1:16-CV-19, 2017 WL 1101078, at *6 (N.D. Ind. Mar. 22, 2017); *PrimeSource Building Prods., Inc. v. Felten*, No. 16 CV 11468, 2017 WL 11500971, at *4 (N.D. Ill. July 6, 2017).  Therefore, the Motion to Dismiss Counts Two and Three is **denied**.

### 3.  **Breach of Fiduciary Duties**

Finally, Count Four alleges Rutherford had a duty of loyalty while employed at Badger and she breached that duty by misappropriating trade secrets and soliciting customers and employees before she quit.  (Filing No. 1 ¶¶ 71–75).  "[A]n employee who plans to leave his current job and go into competition with his current employer must walk a fine line.  Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his employer."  *SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758, 768 (Ind. Ct. App. 2011) (citations omitted).  In addition, "the employee cannot properly use confidential information specific to his employer's business before the employee leaves his employ."  *Id.*

Rutherford next contends that Badger sets forth no allegations that she shared any confidential or trade secret information while she remained employed.  (Filing No. 42 at 18).  She argues that Badger does not allege she downloaded any client information before her departure,

and the mere fact that Rutherford was accessing information about clients whom she serviced is not sufficient to raise an inference that she downloaded the information for the purpose of sharing it with a competitor.  *Id.*  Badger responds with a bulleted list of Rutherford's alleged breaches, including that she installed an unauthorized USB drive to her work computer, emailed confidential information to her personal email address, and accessed Badger's Business Intelligence Tools just prior to her departure, all in violation of the Agreement.  (Filing No. 48 at 26–27).

The Court finds the allegations in the Complaint sufficient to state a claim for breach of fiduciary duties.  As explained above with respect to the breach of confidentiality provision and misappropriation claims, the facts in the Complaint, taken together, are sufficient to plausibly allege that Rutherford attempted to use confidential information in a prohibited manner by emailing confidential documents to her personal email while she remained employed.  That is enough to state a claim even if the mere possibility that she downloaded client information before her departure is not.  Therefore, the Motion to Dismiss Count Four, breach of fiduciary duties, is **denied**.

## IV.    CONCLUSION

A motion to dismiss pursuant to Rule 12(b)(6) does not test whether the plaintiff will prevail on the merits but instead whether the claimant has properly stated a claim.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). For the reasons explained above, the Defendant's Motion to Dismiss (Filing No. 41) is **DENIED**.  The Plaintiff's claims alleged in the Complaint (Filing No. 1) may proceed.

**SO ORDERED**.

Date:    3/31/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

20

Distribution:

Adam Arceneaux
ICE MILLER LLP (Indianapolis)
adam.arceneaux@icemiller.com

Abby DeMare
Ice Miller LLP
abby.demare@icemiller.com

Andrew Dutkanych, III
BIESECKER DUTKANYCH & MACER LLC (Indianapolis)
ad@bdlegal.com

Taylor Jon Ferguson
Biesecker Dutkanych & Macer, LLC
tferguson@bdlegal.com

Sarah Humble
Lewis Roca Rothgerber Christie LLP
shumble@lewisroca.com

Laura Pasqualone
Lewis Roca Rothgerber Christie LLP
lpasqualone@lewisroca.com

Mary Ellen Simonson
Lewis Roca Rothgerber Christie LLP
msimonson@lewisroca.com

Heather Stanton
Rose Law Group pc
hstanton@roselawgroup.com